IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

REBECCA A. BETTS and
R. TERRANCE RODGERS, as Trustees
of the Betts Hardy & Rodgers, PLLC
Retirement Plan,

     Plaintiffs,

v.            CIVIL ACTION NO. 3:13-11772

BENEFIT SOLUTIONS, INC. and
MICHAEL LAUHON,

     Defendants.

**MEMORANDUM OPINION AND ORDER**

  Pending before the Court is a Motion for Summary brought by Third-Party Defendant

Hartford Life Insurance Company ("Hartford"). ECF No. 92.  For the following reasons, the

Court **GRANTS** Hartford's motion for summary judgment.

**I.  FACTUAL BACKGROUND**

  This case concerns management of the Betts Hardy & Rogers, PLLC Retirement Plan, an

employee pension benefit plan within the meaning of § 3(2) of the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(2).[1]  As required under ERISA, Plan assets

are "held in trust by one or more trustees." 29 U.S.C. § 1103(a).  Here, those trustees are

Plaintiffs, Rebecca Betts and R. Terrence Rogers.  As trustees, Plaintiffs brought this action

against Defendants Benefit Solutions, Inc. ("Benefit Solutions") and Michael Lauhon.   Plaintiffs

---

[1] Betts Hardy & Rodgers, PLLC was formerly known as Allen Guthrie & Thomas, PLLC.
Compl. ¶2, ECF No. 1.

allege that Defendants wrongfully caused Retirement Plan assets to be off the market from October 5, 2011, through October 19, 2011, thereby breaching fiduciary duties under ERISA.[2] Compl. ¶¶22–33.   Defendants, in turn, filed a Third-Party Complaint, seeking indemnity and contribution from third-party Defendant, Hartford Life Insurance Company.   The facts giving rise to these claims are summarized below.

### a. Relevant Parties

In addition to Plan trustees, the following individuals and entities were also involved in the management and maintenance of the Betts Hardy & Rodgers Retirement Plan:

(1) Gary C. Smith served as the Plan Administrator. Hartford, Ex. 1 at BH&R 000037, ECF No. 92-1.

(2) Defendant Benefit Solutions served as the Plan's Third-Party Administrator and Record-Keeper. Hartford, Ex. 1 at BH&R 000038, ECF No. 92-1.

(3) MG Trust Company previously served as custodian of Plan assets; a responsibility to be transferred to Third-Party Defendant Hartford Life Insurance. Hartford Ex. 3 at BH&R 000012, ECF No. 92-3.

    a. Four Hartford employees were involved in the transfer of custodianship: Kevin Shamblin, as an outside sales representative; Tom Bianci, as an inside sales representative; Eric Michaud, as a transition coordinator; and Claudia Cahill, as an installation specialist. Hartford Ex. 6 at BH&R 000368.

(4) Kelly Castleberry served as an Investment Advisor. Hartford Ex. 3 at BH&R 000012, ECF No. 92-3.

(5) Mesirow Financial Investment Management, Inc. provided investment advice under an agreement entered into on or about June 27, 2011. Hartford Ex. 7, ECF No. 92-7.

---

[2] Count Two of Plaintiffs' Complaint alleged a professional negligence claim against Defendants Benefit Solutions and Michael Lauhon.  In an earlier Order, this Court dismissed Plaintiffs' professional negligence claim against Defendants as preempted by ERISA. Order, April 7, 2014, ECF No. 39.

Defendants' responsibilities as Third-Party Administrator are especially important to determining the matters at issue here.   According to Defendant Lauhon's discovery responses, as the third-party administrator of the Plan, Benefit Solutions and Mr. Lauhon shared the following responsibilities:

(1) Update Plan documents consistent with changes in applicable tax law;

(2) Provide certain legally required notices to the trustees and the Plan for distribution to the Plan participants;

(3) Calculate employer contributions to the Plan;

(4) Obtain census data from the trustees for all plan participants and perform compliance evaluations using software licensed by Actuarial Systems Corporation;

(5) Process contributions by Plan participants and provide information to MG Trust Company for investment of contributions;

(6) Prepare tax return for Plan;

(7) Facilitate transfer or distribution of funds to participants who left the Plan; and

(8) Facilitate transfer of Plan assets from MG Trust Company to the Hartford.

Hartford, Ex. 2 at 4–5, ECF No. 92-2.

### b. *Decision to transfer Plan funds to Hartford*

In late June 2011, the Executive Committee of Betts Hardy & Rodgers voted to transfer custodianship of the Retirement Plan from MG Trust Company, LLC to Hartford Life Insurance Company.[3]   Hartford Ex. 3, ECF No. 92-3.   That same day, Defendant Lauhon received notice of

---

[3] According to Minutes of the Executive Committee Meeting, "[t]he proposed change would substitute the Hartford [for MG Trust] as our Custodian.   In addition, the Hartford would take over some of the responsibilities currently handled by [the current Recordkeeper,] Benefit Solution[s], specifically the plan website." Hartford Ex. 3, ECF No. 92-3.

Plaintiffs' decision to replace MG Trust with Hartford as the plan custodian. Hartford Ex. 4 at 3, ECF No. 92-4.   That notice further included an explanation that Plaintiffs intended to accomplish that transition in September 2011. *Id.*   Generally speaking, transferring custodianship requires compliance with modest procedural requirements under ERISA as well as the performance of certain substantive tasks.

Procedurally, while a transfer of custodianship is underway, plan participants are unable to access their accounts.   This period of limited access is referred to as the "blackout period." Under ERISA, a plan administrator is required to provide plan participants with at least 30-day written notice of an anticipated blackout period. 29 U.S.C. § 1021(i).   In his deposition, Mr. Lauhon acknowledged that he was aware the transition would require a blackout notice and that sending such notice was typically a function handled by Mr. Lauhon and Benefit Solutions. Lauhon Dep. 69:3–70:17, Ex. 5. *Cf.* Michaud Dep. 11, ECF No. 94-2 (explaining that, as a Hartford New Business Consultant, it is his common practice to draft a blackout notice for use by a third-party administrator).

Substantively, transferring custodianship is a three step process: (1) liquidation of plan assets; (2) transfer of plan assets; and (3) reinvestment of plan assets.   Michaud Dep. 88, ECF No. 94-2.   Information necessary to accomplish the third step—reinvestment—is of particular import in the dispute at issue.   In order to reinvest Plan assets, a responsible party must match—or "map"—investment options available through the transferor custodian (in this case, MG Trust) to investment options available through the transferee custodian (in this case, Hartford).   Once funds are transferred, it is the responsibility of the transferee custodian to then reinvest each participant's

-4-

account into investment options of comparable quality, type, risk, and character.[4] Lauhon Dep. 97–99, Hartford Ex. 5, ECF No. 92-5 (Defendant Lauhon explaining that, as third-party administrator, it was the responsibility of Benefit Solutions to provide information enabling Hartford to reinvest Plan funds into investment options comparable to those used by the transferor custodian, MG Trust); *see also* Defs.' Ex. 4, ECF No. 94-4 (email correspondence from a Hartford Conversion Specialist explaining that "in order for [Hartford] to move forward in the investment process upon receipt of plan assets, [Hartford] will need accurate balances by fund on a plan level as of the date of the plan liquidation, so that we can map the assets into the appropriate investment funds at [] Hartford."). Thus, in this instance, changing plan custodians required Benefit Solutions, as the Third-Party Administrator, to liquidate plan assets, transfer proceeds to the new custodian, and provide information sufficient to enable reinvestment. Lauhon Dep. at 71.

### c. *Preparation: Administrative Services Agreement & Blackout Notice*

On June 27, 2011, Plaintiffs and Hartford entered into an Administrative Services Agreement ("ASA"). Under that agreement, Hartford was to provide "certain nondiscretionary recordkeeping services to the Plan on behalf of the Plan and at the direction of the Plan Administrator." Hartford Ex. 1 at BH&R 000052, ECF No. 92-1. The agreement further explains that Hartford was to "accept instructions and information from the Third-Party Administrator [Benefit Solutions], as agent for the Plan as provided for under this Agreement." *Id.* at BH&R 00053. While Hartford was to accept instruction and information from Benefits Solutions as the Third-Party Administrator, the agreement also provided that "[i]n no event shall Hartford Life be

---

[4] For example, balances invested in a large cap value fund through the transferor custodian, MG Trust, would be matched to a large cap value fund available through the transferee custodian, Hartford. *See* Hartford Ex. 6 at BH&R 000369, ECF No. 92-6.

responsible to provide any service provided by [Benefit Solutions], without limitation, under this Agreement or otherwise." *Id.* In relevant part, the ASA also explained the following allocations of responsibilities and liability:

> If Hartford Life is to establish Participants' Account for a Plan . . . in existence prior to the effective date of this Agreement, . . . the Plan Administrator shall provide to Hartford Life, via medium and format required by Hartford Life, financial and census data which shall include, but is not limited to: (i) the Plan's most recent valuation of Participant Accounts . . . each Participant's total accrued benefit and any sub-account . . . (for example, for different contribution types) on or after the business day preceding the effective date of the Investment Arrangement, or the date Hartford Life agree to recordkeep such amount; (ii) each Participant's Plan year-to-date Contributions allocated prior to the transfer of assets to the Investment Arrangements, or such earlier date as of which Hartford Life agrees to recordkeep such amount; and (iii) such other data identified by Hartford Life to recordkeep and reconcile the Participant Accounts with the assets of the Plan transferred from the current asset custodian ("Transferred Assets"). Hartford Life shall promptly notify the Plan Sponsor if this information is incomplete or does not reconcile with the Transferred assets or records provided by the current asset custodian. . . .

> The Plan Sponsor shall notify Participants . . . (iv) of any black-out period that may occur in connection with the transfer of assets to Hartford Life (as required under ERISA section 101(i)).

*Id.* at BH&R 000054–55; *see also id.* at BH&R 000053 (providing that "[a]ny reference in this Agreement to an agent or agents of the Employer, the Plan, the Plan Sponsor or the Plan Administrator shall include the Third Party Administrator.").

As introduced above, in order to transfer custodianship of plan assets, ERSIA requires that plan participants be given 30-day written notice of a blackout period during which participants may not access their individual accounts. In this case, both Mr. Michaud with Hartford and Defendant Lauhon offered deposition testimony that it was their respective normal practice to prepare blackout notices. Michaud Dep. 49, ECF No. 94-2; Lauhon Dep. 69:3–70:17, Ex. 5; Hartford Ex. 6 at BH&R 000368, ECF No. 92-6. According to internal notes, on July 18, 2011,

Mr. Michaud spoke with Mr. Lauhon regarding preparation and distribution of blackout notices. Michaud Dep. 48–49, ECF No. 94-2.  As recorded by Mr. Michaud, in that conversation he offered to handle the blackout notice, but Mr. Lauhon instead volunteered to handle the task. *Id.*

Ultimately, however, the Plan Administrator provided Plan participants with the required 30-day blackout notice. Email from Gary Smith to Plan participants (Aug. 31, 2011) Defs.' Ex. 5, ECF No. 94-5.   On August 31, 2011, Mr. Lauhon sent a sample blackout notice with the blackout period beginning September 2, 2011 and ending on September 20, 2011. Lauhon Dep. 92:11–23. Presumably using that sample blackout notice as a template, the Plan Administrator then sent a corrected blackout notice providing that the blackout period would begin on October 1, 2011, and end on October 21, 2011.   *Id.*   The notice further advised participants to direct any questions regarding the transfer to Defendant Lauhon with Benefit Solutions. *Id.*

### d.  Execution: Liquidation, Transfer, and Mapping Information

Once the blackout period began October 1, 2011, the parties could take the substantive steps necessary to liquidate, transfer, and invest Plan assets.  As acknowledged by Defendant Lauhon, Benefit Solutions controlled liquidation and transfer of Plan assets. Hartford Ex. 4 at Hartford 00257, ECF No. 92-4 (email from Lauhon on August 29, 2011, explaining to Michaud that Plan assets "are held with [MG] [T]rust and [Benefit Solutions] control[s] the liquidation and wiring. [Benefit Solutions is] the recordkeeper."). Furthermore, all parties agree that it was the responsibility of Benefit Solutions as the Third-Party Administrator to provide a breakdown of transferred funds. Hartford Ex. 6 at BH&R 000368, ECF No. 92-6.   Defendant Lauhon was aware that Hartford needed Benefit Solutions to provide a breakdown of transferred funds "by participant by fund by type of money" in order to "map" the transferred investments. Hartford Ex. 6 at BH&R

000368, ECF No. 92-6.

The majority of Plan assets were liquidated and available for transfer on October 7, 2011, seven days into the 21-day blackout period.  That day, Defendant Lauhon sent the following email to Mr. Michaud at Hartford:

> Eric, I have most of the plan liquidated. The Stable Value [Fund] may take a little longer than I thought. . . . Also, I need the wiring instructions. Sorry if you have already sent them to me. It has just been crazy here lately.

Hartford Ex. 4, ECF No. 92-4 at 33.  Within less than twenty minutes, Mr. Michaud provided Defendant Lauhon with wiring instructions, as requested. *Id.*

Though wiring instructions were in the hands of Benefit Solutions, the liquidated Plan assets were transferred to Hartford some four days later on October 11, 2011.  The morning of October 11, 2011, Defendant Lauhon explained the following to Mr. Michaud by email:

> I just initiated a wire for $7,769,027.94 for [Betts Hardy & Rodgers].  This is the first of two wires. The other wire will come once we get the Stable Value [Fund] money. I will let you know more on the expected date on that by tomorrow. I will get you the breakdown of this wire tomorrow also.

Hartford Ex. 4, ECF No. 92-4 at 35.  Notwithstanding the commitment to send Mr. Michaud the breakdown for the initial wire on October 12, 2011, Defendant Lauhon did not do so until after the close of business seven days later on October 18, 2011.  The very next day, on October 19, 2011, Hartford mapped and reinvested the transferred Plan assets.  Thus, by October 19, 2011, the majority of Plan assets had been reinvested.

With respect to the liquidation and transfer of the remaining Plan assets, as late as October 18, 2011, Defendant Lauhon had neither accomplished the liquidation nor did he have a precise estimate of when liquidation could be accomplished.  By email on October 18, 2011, Defendant Lauhon explained the following to Mr. Michaud:

-8-

> Ok, I am not sure when the second wire will be for the Stable Value Fund.   I dropped the ball a little on that one.   I have to get a form signed by Mr. Wickline to send to them and they will give me a liquidation date early next week.   Most of that money belongs to Mr. Guthrie.

Hartford Ex. 4, ECF No. 92-4 at 39.   Within mere hours of that email, Defendant Lauhon received the requested Stable Value Fund Transfer Form, complete with Mr. Wickline's signature, from Gary Smith. Hartford Ex. 4, ECF No. 92-4 at 41.   Though Benefit Solutions presumably would have then had everything necessary to liquidate and transfer the Stable Value Fund the afternoon of October 18, 2011, Benefit Solutions did not wire the $1,526,137.31 in the Stable Value Fund to Hartford until October 27, 2011.[5]   Hartford reinvested the Stable Value Fund assets that very day.

Throughout the process of liquation and transfer, both Mr. Michaud and Ms. Cahill repeatedly requested that Defendants Lauhon and Benefit Solutions provide the information necessary to reinvest Plan assets. *See generally*, Hartford Ex. 4, ECF No. 92-4.   As late as October 25, 2011, Ms. Cahill was *still* requesting that Defendant Lauhon provide information necessary to map and reinvest Plan assets. Hartford Ex. 4, ECF No. 92-4 at 43, 47.

These delays happened notwithstanding the fact that Mr. Lauhon acknowledges that it is important to accomplish transfer of fund assets after liquidation as quickly as possible, and that in this case, it was the responsibility of Benefit Solutions to ensure transfer as quickly as possible. Lauhon Dep. at 71.   When asked, Mr. Lauhon was unable to explain to the Plan Trustees why liquidation and transfer of Plan assets was delayed, beyond noting that at the time, Defendants were under a "Form 5500 filing crunch period." Hartford Ex. 6 at BH&R 000369, ECF No. 92-6; *see also* Hartford Ex. 4, ECF No. 92-4 at 56 (email from Lauhon to Kelly Castleberry explaining

---

[5] By this time, the blackout period specified in the earlier notice would have already ended, but it does not appear from the record that any subsequent notices extending the blackout period were prepared or distributed.

that "[Benefit Solutions] probably took a little longer than usual getting the numbers to Hartford. [Unforeseen], we were up against the [October 15th] Form 5500 filing deadline which caused my delay. I didn't think we would be under that big of a deadline crunch but it happens. There is obviously never any intent to have delays but it can happen.").   There is no evidence in the record suggesting that Defendants informed any other party of its October 15th filing crunch—not when planning the timing and duration of the blackout notice and not when experiencing actual delays in effecting the liquidation and transfer of Plan assets.

In Count One, Plaintiff alleges that Defendants Benefit Solutions and Michael Lauhon are liable for breach of fiduciary duties under ERISA. Compl. ¶¶25–29, ECF No. 1.   Plaintiffs' cause of action is based on the allegation that "[a]s a direct result of Defendants' actions, the Plan was out of the market from October 5, 2011 through October 19, 2011." Compl. ¶22.   Plaintiffs further allege that "[h]ad the Plan been invested during that time, the value of the assets of the Plan would have substantially increased." Compl. ¶23.   As alleged in the Complaint, Defendants breached fiduciary duties by "failing to liquidate and transfer the Plan assets to The Hartford in a timely manner and failing to timely provide The Hartford with the information needed to allow prompt reinvestment of the Plan assets." Compl. ¶28.

On November 17, 2014, Defendants Benefit Solutions and Michael Lauhon filed a Third-Party Complaint against Hartford. ECF No. 80.   Through that Third-Party Complaint, Defendants allege that Hartford was a fiduciary of the Plan under ERISA and that Hartford breached its fiduciary duties insofar as it "failed to have in place written protocols or procedures outlining the necessary steps, the timing of certain transfer events, and the duties and responsibilities of the various parties, including Plan Administrator, Third-Party Administrator,

-10-

and Plan Trustees," during the transfer of custodianship from MG Trust to Hartford. Third-Party Compl. ¶¶12–13.   Consistent with such allegations, Defendants assert a right to indemnification or contribution from Hartford in the event that a judgment is entered against Defendants. *Id.* at ¶20.

Now pending before the Court is a Motion for Summary Judgment brought by Hartford as Third-Party Defendant. ECF No. 92.   Defendants and Third-Party Plaintiffs, Benefit Solutions and Michael Lauhon, timely filed a Response (ECF No. 94), Hartford timely filed a Reply (ECF No. 96), and the motion is ripe for disposition.   In Section II below, the Court will set out the applicable legal standard.   Section III will address the admissibility and weight appropriately afforded to a declaration offered by Benefit Solutions and Defendant Lauhon.   Section IV will address Hartford's summary judgment motion regarding claims for indemnification and contribution, respectively.

## II.    LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).   In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).   Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).   "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

### III.  CONCERNING THE DECLARATION OF F. JEFFERSON BRAGDON, ESQ.

Defendants supplement arguments and evidence regarding alleged rights to contribution or indemnification with the Declaration of F. Jefferson Bragdon, Esq. Defs.' Ex. 7, ECF No. 94-7. Mr. Bragdon offers the opinion that Hartford "was acting as a Fiduciary when it engaged in June of 2011 to provide services to the Plan . . . including specifically the transfer of the Plan assets to Hartford's own custody and control." *Id.*   Though Defendants rely on Mr. Bragdon's declaration, Defendants neglect to explain any basis for its admissibility.   By its Reply brief, Hartford challenges the admissibility of Mr. Bragdon's declaration. ECF No. 96 at 6–8.   Hartford argues that the declaration is inadmissible insofar as (1) it fails to explain Mr. Bragdon's qualifications as an expert, and (2) Mr. Bragdon's opinions are based on factual assumptions that are unsupported

-12-

by—and even in direct conflict with—competent undisputed evidence. *Id.*

Generally, Rule 56(c)(3) provides that, '[a]n affidavit or declaration used to support or oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c) (2015).  For purposes of summary judgment, "[a]n expert's affidavit that is wholly conclusory and devoid of reasoning does not comply with Fed. R. Civ. P. 56(e)." *M & M Medical Supplies and Service, Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 165 (4th Cir. 1992).  More broadly, Federal Rule of Evidence 702 generally governs testimony by expert witness by providing that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

A district court considering the admissibility of expert testimony exercises a gate keeping function to assess whether the proffered evidence is sufficiently reliable and relevant.   The inquiry to be undertaken by the district court is "a flexible one" focusing on the "principles and methodology" employed by the expert, not on the conclusions reached.  *See Daubert*, 509 U.S. at 594-95, 113 S. Ct. 2786.   In making its initial determination of whether proffered testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved.  *See Kumho Tire Co.*, 526 U.S. at 151, 119 S. Ct. 1167.  With respect to relevance, "expert testimony does not 'assist' if it is unrelated to facts at issue or is based on factual assumptions that are

not supported by evidence." 29 Fed. Prac. & Proc. § 6264 (1st ed.) (citations omitted).

Here, Mr. Bragdon's declaration offers no explanation whatsoever of his qualifications.[6] Whatever those qualifications may be, Mr. Bragdon put them to use in considering whether Benefit Solutions, Mr. Lauhon, or Hartford were fiduciaries under ERISA with respect to the services each offered the Plan, and if so, whether any among them violated known duties of care.[7] *Id.* Such judgments inherently depend on legal interpretations. In terms of methodology, Mr. Bragdon explains that he relied upon sources considered at the time of the Preliminary Report—which apparently has not been presented to the Court or otherwise entered into the record—as well as the Third Party Complaint, Hartford's Motion for Summary Judgment, and the depositions of Eric Michaud, Kelly Castleberry, and Michael Lauhon. *Id.*

Absent some attempt to explain Mr. Bragdon's qualifications, the Court is left unable to assess whether Mr. Bragdon possesses the necessary knowledge, skill, experience, training, or education to render him qualified to offer an expert opinion. Moreover, as argued by Hartford in its Reply, Mr. Bragdon's opinions appear to be based on mischaracterizations or misstatements of the record evidence. *See* Reply at 7–8, ECF No. 96. Mr. Bragdon's opinions are irrelevant insofar as his opinions rely on such mischaracterizations.

Most curious to the Court, however, is that Mr. Bragdon appears to be offering not scientific or technical expertise, but legal expertise. *See Safeway, Inc. v. Sugarloaf Partnership, LLC*, 423 F.Supp.2d 531, 538 (D.Md. 2006) ("Evidence supplied by experts as to legal conclusions is not admissible, nor indeed 'evidence' at all." (quoting *Nutrition 21 v. United States*,

---

[6] Based on his title, the Court assumes Mr. Bragdon is an attorney.
[7] Though Mr. Bragdon focuses on fiduciary statuses of the parties, as discussed below, the fiduciary status of Mr. Lauhon, Benefit Solutions, and Hartford is not determinative of Defendants' claims for indemnification and contribution.

-14-

930 F.2d 867, 871 n.2 (Fed. Cir. 1991) (internal quotations omitted))).   In the span of less than

three pages, Mr. Bragdon's declaration introduces the statutory definition of "fiduciary" under

ERISA, provides a citation to a single Supreme Court case on the question, and then presumably

uses that paltry legal framework to support the legal conclusions that follow.   Frankly, in the

expert legal opinion of the Court, considerably more is necessary to reach ultimate conclusions

regarding the fiduciary status of the respective parties.

    Thus, even without reaching the question the admissibility, the Court finds that Mr.

Bragdon's legal conclusions offer no assistance to the Court.   Mr. Bragdon introduces no factual

evidence derived from his personal knowledge, instead he merely reviews the same record

evidence before the Court and relatively few legal authorities, and on that basis, offers legal

conclusions.   Such conclusions are the province of the Court, not "legal experts" retained by

either party.   *Safeway*, 423 F.Supp.2d at 539–40 ("'It is the responsibility—and the duty—of the

court to state . . . the meaning and applicability of the appropriate law,' and—when aided by the

capable legal argumentation of counsel—it has ample legal expertise to do so." (quoting *Adalman*

*v. Baker, Watts, Co.*, 807 F.2d 359, 366 (4th Cir. 1986))).

## IV.    DISCUSSION

### A.  *Assuming ERISA Fiduciary Liability*

    Plaintiffs' only claim against Defendants Michael Lauhon and Benefit Solutions alleges

that Defendants breached fiduciary duties under ERISA.[8]   Accordingly, for Defendants to be

---

[8] "In every case charging breach of ERISA fiduciary duty, . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).   Many activities relating to an ERISA plan involve fiduciary responsibilities, but not all.   Under the

-15-

entitled to contribution or indemnification from Third-Party Defendant Hartford, Defendants must first be held liable under Plaintiffs' claim for breach of fiduciary duties.   Thus, for purposes of considering Hartford's motion for summary judgment, it is not necessary to determine whether Defendants had fiduciary duties and whether those duties were breached.   Instead, for purposes of considering the instant motion, the Court will *assume* Defendants are liable to Plaintiffs as alleged in Plaintiffs' complaint.[9]   Operating under that assumption, the Court must confront the resulting question of whether Defendants may then seek contribution or indemnification from Hartford.

### B.  Common Law Implied Indemnity

Under West Virginia law, "[t]here are two basic types of indemnity: express indemnity, based on a written agreement, and implied indemnity, arising out of the relationship between the parties." Syl. pt. 1, *Valloric v. Dravo Corp.*, 357 S.E.2d 207 (W. Va. 1987).   As argued by Hartford, undisputed evidence shows that there is no written agreement between the parties whereby Hartford expressly agreed to indemnify Benefit Solutions.   Indeed, there does not appear

---

statute, a person is a fiduciary relative to an employee benefit plan to the extent that:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.   In contrast, a person who performs purely ministerial functions . . . for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

29 C.F.R. § 2509.75–8.

[9]  The Court draws no actual conclusions regarding the fiduciary status of Defendants.

to be any written contract directly between Benefit Solutions and Hartford.  Instead, Hartford

contracted directly with the Plan Trustees, and by that agreement, expressly provided that Hartford

was not assuming any responsibilities assumed by Benefit Solutions as the Third-Party

Administrator.   Because it is undisputed that there was no contract between Benefit Solutions and

Hartford, as a matter of law, Benefit Solutions cannot sustain a claim for express indemnification,

leaving only the options of implied indemnification and contribution.

Turning first to implied indemnity, the Court first notes that "the concept of implied

indemnity is based on equitable principles arising from the special nature of the relationship

between the parties." *Sydenstricker v. Unipunch Products, Inc.*, 288 S.E.2d 511, 515 (W.Va.

1982).

> The remedy of implied indemnity is an independent cause of action based primarily
> on principles of restitution: "A person who, without personal fault, has become
> subject to tort liability for the unauthorized and wrongful conduct of another, is
> entitled to indemnity from the other for expenditures properly made in discharge of
> such liability."

*Hill v. Joseph T. Ryerson & Son*, 268 S.E.2d 296, 301 (W.Va. 1980) (quoting Restatement of

Restitution § 96 (1937).   "In the typical case, the indemnitee is made liable to the injured party

because of some positive duty created by statute or the common law, but the actual cause of the

injury was the act of the indemnitor." Syl. pt. 2, *Hill v. Joseph T. Ryerson & Son, Inc.*, 268 S.E.2d

296 (W. Va. 1980).   Thus, implied indemnity is only available where the following elements are

satisfied: "(1) an injury was sustained by a third party; (2) for which a putative indemnitee has

become subject to liability because of a positive duty created by statute or common law, but whose

independent actions did not contribute to the injury; and (3) for which a putative indemnitor should

bear fault for causing because of the relationship the indemnitor and indemnitee share." Syl. pt. 4,

*Harvest Capital v. W. Va. Dep't of Energy*, 560 S.E.2d 509 (W. Va. 2002).

Under these principles, it is clear that a putative indemnitee, such as Benefit Solutions, "must be without fault to obtain implied indemnity." *Sydenstricker*, 288 S.E.2d at 515. Here, however, undisputed record evidence plainly shows that Defendants, in the very least, shared fault for the delays in effecting the liquidation, transfer, and reinvestment of Plan assets.[10] Defendants identify no evidence suggesting that any other party is responsible for the liquidation of the majority Plan assets beginning on October 5, 2011, several days after the blackout period commenced. Defendant Lauhon expressly assumed responsibility for delays relating to the liquidation of the Stable Value Fund. Hartford Ex. 4 at 39, ECF No. 92-4; Lauhon Dep. 118–19, ECF No. 92-5. The undisputed evidence further shows that Defendants alone had the ability and responsibility to liquidate Plan assets. Thus, <u>if</u> there is any possible fault related to delays in liquidation that contributed to Plaintiffs' alleged harm, that fault would necessarily rest with Defendants.

Similarly, the undisputed evidence also shows that Defendants alone had the ability and responsibility to transfer liquidated funds to Hartford. Defendants had the information necessary to wire funds at least as early as October 7, 2011, yet the transfer of the majority of Plan assets was

---

[10] The majority of Defendants' Response to Hartford's Motion for Summary Judgment focuses on responsibility for providing the blackout notice to Plan participants and an alleged failure on the part of Hartford to set a timetable or provide explicit instructions regarding the blackout notice as well as how and when Plan assets were to be transferred to Hartford. ECF No. 94. Related to these factual assertions, Defendants further maintain that Benefit Solutions was a non-fiduciary agent of the Plan with respect to the asset transfer. ECF No. 94.

Though the Complaint does reference an intended September transfer, by the Court's reading, Plaintiffs' claim for damages centers on delays between liquidation and reinvestment in October—*not* delays resulting from a failure to timely send out a blackout notice or to complete transfer of custodianship in September 2011. Responsibility for and timing of the blackout notice is simply beside the point.

not initiated until October 11, 2011.   Though Defendant Lauhon made commitments to transfer the remaining Plan assets from the Stable Value Fund shortly thereafter, Benefits Solutions did not transfer such funds until October 27, 2011—some fifteen days later and after the end of the noticed blackout period.   Defendants identify no record evidence to suggest that Hartford did anything to impede transfer of liquidated assets.   Thus, <u>if</u> there is any possible fault related to delays in transferring liquidated Plan assets that contributed to Plaintiffs' alleged harm, that fault would rest with Defendants.

Finally, the undisputed evidence also shows that Defendants alone had the ability and responsibility to provide the information necessary to reinvest Plan assets once transferred. Despite unrelenting efforts by Hartford and others, Defendants failed to provide the necessary information to reinvest Plan assets for some time after funds were transferred.   Defendants did not provide the necessary information to reinvest Plan assets from the first transfer until October 18, 2011—eleven days after liquidation and one week after transfer to Hartford.   As explained by Defendant Lauhon, these delays occurred because he "chose to make the tax deadline more important than anything else than we had going on," and not because Hartford did anything to impede Defendants from meeting their obligations. Lauhon Dep. at 135, ECF No. 92-5.   When Defendants did ultimately provide the necessary information, Hartford promptly mapped and reinvested accounts according to that information.   Thus, whatever the cause for delay, the undisputed evidence offers nothing to suggest fault on the part of Hartford, though considerable fault might be attributed to Defendants.

In sum, Defendants identify no direct act or omission on the part of Hartford to justify the delays in the liquidation, transfer, or reinvestment of Plan funds.   The only faults to be found

related to delays in the liquidation, transfer, or reinvestment of Plan funds are the result of Defendants' independent acts and omissions.  Instead, Defendants make a general argument that they are entitled to indemnification from Hartford because Hartford failed to adequately direct Defendants' actions.  Hartford had no such obligation, express or implied.  To the extent that Hartford may have assumed a coordinating role, the record evidence unequivocally shows that Hartford made every reasonable effort to prompt Defendants to fulfill their obligations.  More to the point, even if some fault may be attributed to Hartford, undisputed evidence unequivocally demonstrates that Defendants were not without fault.  Accordingly, as a matter of law, Benefit Solutions and Defendant Lauhon are not entitled to implied indemnification from Hartford.

### C.  Common Law Contribution

Not unlike indemnification, "[t]he doctrine of contribution has its roots in equitable principles. The right to contribution arises when persons having a common obligation, either in contract or tort, are sued on that obligation and one party is forced to pay more than his *pro tanto* share of the obligation." Syl. Pt. 4, *Sydenstricker*, 288 S.E. 2d at 518.

Defendants Benefit Solutions and Mr. Lauhon have not identified a common obligation shared by Defendants and Hartford. *See* ECF No. 94.  Under the Administrative Services Agreement, Benefit Solutions, as the Third-Party Administrator, and Hartford Life, as the Plan Custodian, had distinctly allocated responsibilities to the Plan.  Here, Plaintiffs are alleging the breach of responsibilities that can only be laid at the feet of Benefit Solutions and Mr. Lauhon. Defendants have not alleged a single fact suggesting that some act, omission, or oversight on the part of Hartford at all interfered with Defendants' ability (1) to timely liquidate funds, (2) to transfer funds immediately upon liquidation, or (3) to provide information necessary to map and

reinvest Plan assets; yet, Defendants did not meet their obligations to do so.

Instead, Defendants argue a right to contribution arising from the suggestion that Hartford acted as the "captain of the ship" and the party "responsible for directing [Benefit Solutions] on what steps, if any, to take and when."[11] ECF No. 94 at 18.   Even assuming that to be true, it would not create a shared fiduciary obligation.   Moreover, the undisputed evidence shows repeated attempts on the part of Hartford to prompt Defendants Lauhon and Benefit Solutions to fulfill their unique obligations to the Plan.   As shown by the discussion above, the responsibility to liquidate Plan assets, transfer Plan assets, and provide information necessary to map and reinvest Plan assets rested with Defendants Lauhon and Benefit Solutions.   Defendants have not identified any evidence in the record suggesting that any other involved party could have fulfilled those obligations.   Instead, the undisputed evidence shows that Defendants elected to prioritize other demands at the expense of promptly meeting obligations to the Plan.   If liability flows from that decision, it must flow only to Defendants.

Thus, viewing the evidence in the light most favorable to Defendants, Defendants and Hartford shared no common obligation.   In the absence of some common obligation, as a matter of law, should Defendants be held liable for the delays alleged by Plaintiffs, Defendant is not entitled to demand contribution from Hartford.

---

[11]  Defendant also relies on deposition testimony from Kelly L. Castleberry, an investment advisor for the Plan, for the proposition that "Eric [Michaud] was in charge of the transition." *See* ECF No. 94 at 6–7 (citing Castleberry Dep. 77 (Sept. 19, 2014), ECF No. 94-3).   Reading Mr. Castleberry's testimony in context, it is immediately clear that Mr. Castleberry's comment was relative to Hartford's internal structure, and nothing more. Castleberry Dep. 77, ECF No. 94-3 ("Hartford's structure is: They have different roles and responsibilities. They have a sales team that comes in and lands the business, and then they have the takeover specialists and then they have the transition specialists and then they have the ongoing support team. So Eric [Michaud] was in charge of the transition.").

## V.    CONCLUSION

For the foregoing reasons, Third-Party Defendant Hartford Life Insurance Company's Motion for Summary Judgment (ECF No. 92) is **GRANTED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        August 12, 2015

ROBERT C. CHAMBERS, CHIEF JUDGE